## AFFIDAVIT

I, Juan Yebra, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am a Special Agent with the Drug Enforcement Administration (DEA), duly appointed according to law and acting as such. I was hired as a Special Agent with the DEA in 2022 and currently assigned to the Burlington, Vermont Resident Office (BRO). My assignments have included investigating criminal violations of federal narcotics offenses related to the possession and distribution of controlled substances.

2. Prior to my employment with DEA, I was employed by the United States Border Patrol as a Border Patrol Agent for over 12 years, during which time I also participated in investigations involving illegal human smuggling and narcotics offenses related to the possession and distribution of controlled substances. While working in this capacity, I have conducted or participated in surveillance, intelligence collection and analysis, debriefings of informants, reviews of recorded conversations, and participated in investigations that included the interception of electronic communications.

3. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed; the methods of payment for such drugs; the laundering of drug proceeds; and the terminology and coded language used by drug traffickers. Based on my training and experience, I am familiar with slang and jargon utilized in the distribution of controlled substances. I am also familiar with drug traffickers' methods of transporting bulk-cash drug proceeds and have participated in the execution of drug search warrants and drug related arrest. With respect to drug trafficking investigations, I have worked directly with confidential sources and informants to conduct controlled purchases of controlled substances. During these investigations, I have listened to and reviewed

communications between individuals involved in, or suspected to be involved in, the distribution of controlled substances. As a result of these investigations, I also have experience in debriefing defendants, informants, participants, and various persons directly involved in buying and distributing controlled substances and the organizational structure of enterprises that traffic in controlled purchases.

4.   As a Special Agent, I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrest for, offenses enumerated in Section 2516 of Title 18, of the United States Code.

5.   This affidavit is made in support of the issuance of a search warrant allowing law enforcement to search cellular phones, described below and in Attachment A, for evidence of drug distribution offenses. As set forth below, there is probable cause to believe that Ron THOMAS, aka "J," and others with him at the time of a vehicle crash on May 31, 2024, were engaged in the distribution of controlled substances in violation of 21 U.S.C. § 841(a) and possessed controlled substances with the intent to distribute them in violation of 21 U.S.C. § 841(a), and 18 U.S.C. § 2. There is further probable cause to believe that the evidence of these offenses, described in Attachment B, will be found in the phones described in Attachment A. The cellular phones listed in Attachment A (hereinafter collectively "the Seized Phones") are:

- White iPhone in clear case recovered from Ron Thomas;
- Black Samsung phone recovered from Ron Thomas (tied to the phone number used in controlled buys);
- Black iPhone, no case, with lock screen displaying back of a hand recovered from Da'ron Thomas.

The Seized Phones are currently secured at the Burlington Police Department in Burlington, Vermont.

2

6.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, as well as the investigation and observations of other law enforcement officers involved in this investigation. This affidavit is intended only to show that there is probable cause to believe that THOMAS and others committed the aforementioned offenses, and that evidence of those offenses will be found in the Seized Phones and does not set forth each and every fact known to me concerning this investigation. Unless indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PROBABLE CAUSE

7.      During the month of May 2024, BPD Detective Joseph Corrow met with a CS[1] regarding a person the CS knew as "J" who was involved in the sale and distribution of suspected cocaine. The CS stated the CS was in a position to purchase crack cocaine from an individual the CS knew as "J."

### Week of May 5, 2024 Controlled Purchase

8.      During the week of May 5, 2024, a plan was formulated to have the CS complete a controlled purchase of crack cocaine from a person the CS knew to be "J." The CS advised law enforcement that the CS has purchased suspected crack cocaine previously from "J."

9.      During the week of May 5, 2024, investigators completed one controlled purchase of suspected crack cocaine from "J." The controlled purchase was completed by the CS. The CS met with investigators at a predetermined location and was searched before, and after, the

---

[1] The CS was assisting investigators in exchange for monetary compensation. The CS has prior criminal convictions to include the following: 1x felony conviction for assault and robbery, 2x misdemeanor convictions for retail theft. CS has previously provided reliable information that has led to arrests. The CS is known by law enforcement to be a drug user. The CS is actively seeking substance abuse treatment.

3

controlled purchase by investigators and found to have no drugs, paraphernalia, or large sums of money. The CS was also provided a known amount of serialized U.S. currency to complete the anticipated transaction.

10. Under the direction of law enforcement, the CS stated that the CS made contact with "J" via the phone number the CS knew to be used by "J," **802-391-7843**. The CS agreed to purchase crack cocaine from "J." During the phone call, the CS arranged the drug transaction to occur at a known location in Burlington, VT.

11. The CS travelled with investigators to an area in close proximity to the area of the anticipated transaction. Shortly after arriving in the area, the CS separated from investigators and began travelling to the anticipated transaction location. As the CS travelled to the area of the anticipated meet location, the CS was kept under surveillance by BPD Detectives Padric Hartnett, Det. Julian Gonzalez, Det. Joseph Corrow, DEA BRO Task Force Officer (TFO) Durwin Ellerman, and BPD Sgt. Philip Tremblay.

12. Det. Gonzalez observed and video recorded the CS make contact with an occupant of a Ford bearing NY registration LJL1721. This registration is assigned to a white 2024 Ford Expedition and is registered to Hertz Vehicles LLC at 900 Doremus Ave, PT Newark, NJ 07114. The CS was kept under surveillance following the controlled purchase until meeting back up with Det. Harnett and Det. Corrow.

13. The CS stated that, upon meeting with investigators, the CS provided all of the crack cocaine that the CS purchased from "J". The CS stated that the CS provided "J" with the serialized U.S. currency. The CS was searched after the controlled purchase and was found to have no illegal drugs, paraphernalia, or large sums of money.

4

14. Back at the BPD, Det. Corrow field tested, and photographed, the suspected crack cocaine and the substance field-tested presumptive positive for crack cocaine.

### Week of May 12, 2024 Controlled Purchase from THOMAS

15. During the week of May 12, 2024, investigators completed an additional controlled purchase of suspected crack cocaine from "J." The controlled purchase was completed by the CS. The CS met with investigators at a predetermined location and was searched before, and after, the controlled purchase by investigators and found to have no drugs, paraphernalia, or large sums of money. The CS was equipped with an audio/video transmitter to monitor the safety of the CS and pursuant to a State of Vermont wire warrant granted by the Honorable Judge Navah Spero the week of Sunday, May 12, 2024. The CS was also provided a known amount of serialized U.S. currency to complete the anticipated transaction.

16. Under the direction of law enforcement, the CS stated that the CS made contact with the person the CS knew as "J" via the phone number of **802-391-7843**. This phone call was recorded via the aforementioned state search warrant. During the phone call, the CS arranged the drug transaction to occur at a known location in Burlington, VT.

17. The CS travelled with investigators to an area in close proximity to the area of the anticipated transaction. Shortly after arriving the area, the CS separated from investigators and began travelling to the anticipated transaction location. As the CS travelled to the area of the anticipated meet location, the CS was kept under surveillance by Det. Hartnett, Det. Gonzalez, Det. Corrow, TFO Ellerman, and Sgt. Tremblay.

18. Det Gonzalez observed the CS walking in the direction of the white Ford Expedition parked at the known location. The CS was seen making contact with "J" on the audio/video transmitter. As described below, based on the observations of "J" during the

controlled buy and the covert video, law enforcement later identified "J" as Ron THOMAS. Later review of the video captured from the body wire worn by the CS showed THOMAS handing the suspected crack cocaine to the CS. Det. Gonzalez observed the CS exit the white Ford Expedition following the controlled purchase. The CS was kept under surveillance following the controlled purchase until meeting back up with Det. Harnett and Det. Corrow. Investigators determined the vehicle was the same rental vehicle used during the previous controlled purchase (Ford Expedition with NY registration LJL1721).

19. The CS stated that, upon meeting with investigators, the CS provided all of the crack cocaine that the CS purchased from "J." The CS stated that the CS provided "J" with the serialized U.S. currency. The CS was searched after the controlled purchase and was found to have no illegal drugs, paraphernalia, or large sums of money.

20. Back at the BPD, officers field tested, and photographed, the suspected crack cocaine and the substance field-tested presumptive positive for crack cocaine.

## Drug Tip

21. On May 28, 2024, Corporal Jennifer Cousins of BPD sent an email to the BPD drug unit advising that there had been drug tips advising of increased drug activity in the area of 396 South Winooski Avenue. The tip stated that a white Ford Expedition bearing NY registration LJL1721 parked in the area for hours at a time and people would show up, get into the passenger seat for a short duration, then exit and leave. It should be noted the vehicle given through the tip is the same vehicle observed during the controlled purchases. I recognize from my training and experience that these described interactions appear to be short duration stops consistent with drug transactions.

22. On May 29, 2024, TFO Ellerman, Det. Corrow, and Sgt. Tremblay, conducted surveillance on the white expedition during which TFO Ellerman video recorded THOMAS getting into the driver's seat and driving away. At that time, Det. Corrow had a state GPS location search warrant active on the cellular phone number **802-391-7843**, and the GPS location of the phone assigned **802-391-7843** was consistent with TFO Ellerman's observations of THOMAS getting into the Expedition.

## Incidents on May 31, 2024

23. On May 31, 2024, at 6:17 PM, BPD officers responded to 198 Main Street in Burlington, Vermont, for a report of two people that had been involved in an altercation involving a firearm. Officers determined that Ron THOMAS and an unidentified black male appeared to be engaged in an argument. THOMAS then produced a silver handgun. A white Ford Expedition was seen leaving the area with white out of state plates (consistent in color with the NY plates for registration LJL1721). THOMAS was later seen on security footage in the Burlington area brandishing what appeared to be a silver handgun.

24. At approximately 6:56 PM, Burlington Police Dispatch advised they had received a call from a male who had been threatened by three black males in a white Ford Expedition bearing NY Registration LJL1721. It should be noted this is the same vehicle and registration that was used by "J" in the controlled purchases described above. The complainant advised they were a Hertz contractor and were attempting to repossess the Ford Expedition. During the attempted repossession, one of the occupants of the vehicle threatened the Hertz contractor with a firearm. The males then ran from the white Ford Expedition and entered a black Ford Expedition bearing NY Registration LJL1654 and left the area. The black Ford Expedition was identified as also being a rental vehicle from Hertz.

7

25. Burlington Police Dispatch began receiving GPS location data from Hertz as to the location of the black Ford Expedition. The vehicle was located at the Pearl Street Beverage located at 240 Pearl St. in Burlington, Vermont. The vehicle then left the area at a high rate of speed and on the wrong side of the road causing officers to initiate a pursuit due to the apparent extreme level of danger to the public from the operation of the vehicle.

26. The vehicle eventually crashed in Colchester, Vermont, after BPD officers had ended the pursuit. Two of the vehicle occupants died in the crash. Three other occupants of the black Ford Expedition were detained and ultimately taken into custody. The three surviving occupants were: Ron Thomas, Da'Ron Thomas (younger brother of Ron Thomas), and Tayami Barnes.

27. Det. Sgt. Tremblay responded to the scene of the crash due to his previous knowledge of drug distribution with the white Ford Expedition bearing NY Registration LJL1721 and "J." On scene, Det. Sgt. Tremblay recognized THOMAS as "J," the male who had completed the physical hand-to-hand transactions in the above noted controlled purchases.

28. Officers first located items at the crash scene that had been thrown from the vehicle at the time of the crash. This included approximately 800 grams of a substance that field tested positive for cocaine. No firearms were located around the crash scene. A later search of the black Ford Expedition pursuant to a Vermont state search warrant recovered over $7,000 in U.S. currency, a loaded .25 caliber pistol, and several cellular phones, as well as additional drugs and drug paraphernalia among other items.

29. THOMAS was arrested on state drug charges and found to be in possession of two phones., a white iPhone in a clear case (Seized Phone 1) and a black Samsung phone (Seized Phone 2). Back at BPD, TFO Ellerman dialed the phone number used to setup the two

controlled purchases (**802-391-7843**). The black Samsung phone (Seized Phone 2) began to ring, showing an incoming call from 802-540-9999, which is a BPD phone extension.

30. Da'ron Thomas, younger brother to THOMAS, was also arrested on state drug charges. He was found to be in possession of a black iPhone, with no case, and a lock screen displaying the back of a hand at the time of his arrest (Seized Phone 3). After his arrest, Da'ron Thomas waived is *Miranda* rights and agreed to speak with law enforcement. During an interview with Burlington Police, Da'ron Thomas admitted that he knew his brother [Ron THOMAS] was selling illegal narcotics. Da'ron Thomas he stated he overheard Ron THOMAS talking about how much money he made. Da'ron Thomas then later stated that he thought the cocaine was already in the black Expedition when he got into it as part of the swap from the white Expedition. Da'ron Thomas stated he observed Ron THOMAS had a gun and corroborated Ron THOMAS getting into the initial altercation by Mr. Mike's Pizza involving brandishing a firearm.

### Training and Experience Regarding Cellular Phones and Drug Trafficking

31. Based on my training and experience and communications with other agents, I am aware that:

   a. Persons who participate in the distribution of controlled substances frequently use cellular telephones, among other communications devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs. People involved in distribution of controlled substances will also often try to maintain a consistent phone number across devices so that their drug-related contacts can locate them to facilitate drug deals.

   b. Information stored in the memories of these communication devices constitutes evidence of drug trafficking. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled.

9

    c. With their cellular phones, drug dealers often take photographs or videos of drugs, drug paraphernalia, guns, other members of their organizations, cash and assets obtained from profits of drug sales, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of those cellular phones.

    d. Distributors of controlled substances often carry firearms to protect both their product as well as any profits they may obtain from their distribution activities. I am aware of investigations (related to the distribution of controlled substances) in which evidence of unlawful purchases and possession of firearms have been found in the data stored in cellular telephones, including photos stored in the cellular telephone memory – some of which have depicted firearms or individuals possessing firearms – text messages or calls to arrange the purchase of a firearm, or contact with a seller of a firearm through an online advertisement. Often, the same cellular telephones contain evidence related to the distribution of controlled substances, including photographs of controlled substances and bulk United States currency.

    e. Friends and family members communicate with each other about coordinating plans to get together. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos. This information is helpful to establish the person using the device during a particular timeframe.

    f. Individuals who commit crimes together or who know about crimes committed by their close associates, may communicate about those crimes through electronic communications that would be stored on a cellular telephone. The communications would be similar to those noted in the previous subparagraph.

## **CONCLUSION**

32. Based on the information set forth above, I submit there is probable cause to believe Ron THOMAS, aka "J," and others with him at the time of a vehicle crash on May 31, 2024, were engaged in the distribution of controlled substances in violation of 21 U.S.C. § 841(a) and possessed controlled substances with the intent to distribute them in violation of 21 U.S.C. § 841(a), and 18 U.S.C. § 2. There is further probable cause to believe that the evidence of these offenses, described in Attachment B, will be found in the phones described in

10

Attachment A. Because the Seized Phones are already in law enforcement's possession, I request authorization to execute the warrant at any time of day or night.

Respectfully submitted,

_____
SA Juan Yebra
Drug Enforcement Administration

Subscribed and sworn to before me on this /4th day of June 2024.

_____
HON. KEVIN J. DOYLE
United States Magistrate Judge
District of Vermont